1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   SUN GROUP U.S.A. HARMONY CITY,          Case No.  17-cv-02191-SK
    INC.,
8
                      Plaintiff,
9                                           **ORDER ON MOTION FOR SUMMARY**
                                            **JUDGMENT**
           v.
10
                                            Regarding Docket No. 280
11  CRRC CORPORATION LTD,

                      Defendant.
12

13         This matter comes before the Court upon consideration of the motion for summary

14  judgment filed by Defendant CRRC Corporation Ltd. ("CRRC").  Having carefully considered the

15  parties' papers, relevant legal authority, and the record in the case, and having had the benefit of

16  oral argument, the Court hereby GRANTS CRRC's motion for the reasons set forth below.

17                              **BACKGROUND**

18         This case centers around a cooperation agreement signed by Plaintiff Sun Group U.S.A.

19  Harmony City, Inc. ("Sun Group") and China CNR Corporation, Ltd. ("CNR") in 2014.  CNR

20  later changed its name to CRRC, and a subsidiary, CNR MA, later changed its name to CRRC

21  MA.  The Court will refer to CRRC and CRRC MA as CNR and CNR MA interchangeably.  CNR

22  Changchun, another subsidiary, also later became known as CRRC Changchun.

23         In 2014, Sun Group and CRRC made an agreement, the Cooperation Agreement, that

24  relates to Sun Group's efforts to assist CRRC in making bids for manufacturing high speed rail

25  cars in North America and the commission to which Sun Group would be entitled for successful

26  bids for manufacturing high speed rail cars.  The "Cooperation Agreement"[1] states, in pertinent

27  _____

28         [1] The parties vigorously dispute the legal impact and meaning of the Cooperation
    Agreement.  However, because the Court finds that CRRC's motion for summary judgment should

United States District Court
Northern District of California

part:

> Whereas, based on the Parties' cooperation foundation and complementary advantages, "CNR" and "Sun Group" hereby reach the following consensus in order to ensure successful bidding for the California High Speed Rail Project . . .
>
> 1. Each Party shall bear its respective expenses prior to bidding;
>
> 2. Through negotiations between the Parties, in principle, "Sun Group" shall be entitled to cooperation earnings of 6%-10% of contract amount after the bid has been won. . . . To ensure meeting the needs of the bid, the final earning percentage shall be the confirmed final percentage determined by the Parties prior to tendering the bid.
>
> 3. Regarding the scope of the cooperation: This agreement is exclusive in nature solely with respect to the California High Speed Rail Project. Whereas, through years of efforts, "Sun Group" communicated and has reached understanding of intent with governments of Mexico, Canada, and relevant governmental agencies, the Parties agree that, in order to enable CNR's product to enter into the further expanded North American markets, the Parties shall be priority and non-exclusive strategic partners, enabling the Parties to better utilize their respective resources as an advantage.

(Dkt. No. 282-3 (Declaration of Jonathan Sun), ¶ 4, Ex. C.) Unfortunately, Although Sun cites the Cooperation Agreement and states that it is attached as Exhibit C to the Sun Declaration, Sun Group did not actually attach Exhibit C to Sun's Declaration, because the exhibits stop at Exhibit B. (Dkt. No. 282-3.) Sun Group attached a copy of the Cooperation Agreement to its Third Amended Complaint ("TAC"), and for purposes of describing the dispute and Sun Group's contentions, the Court will assume that document is the same agreement attached as Exhibit C to the Sun Declaration. (Dkt. No. 102-1 (Exhibits to TAC), Ex. 5.) However, Sun Group failed to submit the Cooperation Agreement as evidence for this motion.

At issue in this case are five North American contracts for manufacturing of rail cars. Again, there is no evidence before the Court on the existence and content of the five contracts, because Sun Group did not provide them for this motion. However, for purposes of understanding the context of the parties' dispute, the Court identifies them here as described by Sun Group in its

---

be granted on other grounds, the Court need not discuss the parties' competing interpretations and their supporting evidence.

Memorandum of Opposition: (1) a contract by CNR MA (now CRRC MA) to provide "rolling stock" to the Massachusetts Bay Transit Authority (the "MBTA Contract"); (2) a contract by CRRC MA to provide "rolling stock" to the Los Angeles County Metropolitan Transit Authority (the "Los Angeles Contract"); (3) a contract by CRRC MA to provide "rolling stock" to the Southeastern Pennsylvania Transportation Authority (the "Philadelphia Contract"); (4) a contract by CRRC Sifang America Inc. to provide "rolling stock" to the Chicago Transit Authority (the "Chicago Contract"); and (5) a contract by CRRC Tangshan Co., Ltd. to provide "rolling stock" to Montreal, Canada's Agence Metropolitaine de Transport (the "Montreal Contract").  (Dkt. No. 282.)

**A.    Claims.**

After several rounds of motions to dismiss, the claims filed by Sun Group have been limited to two claims:  (1) breach of contract against CRRC based on the MBTA Contract, the Los Angeles Contract, and the Philadelphia Contract, and (2) breach of the implied covenant of good faith and fair dealing based on the projects in Los Angeles Contract, the Philadelphia Contract, the Chicago Contract, and the Montreal Contract.

**B.    Discovery.**

In its opposition, Sun Group posits that its ability to obtain discovery was limited by the Court's Order requiring it to proceed through the Hague Convention on the Taking of Evidence in Civil or Commercial Matters ("Hague Convention"), 23 U.S.T. 2555, to seek discovery from CRRC, which is located in the People's Republic of China ("China").  Although the Court required Sun Group to obtain discovery against CRRC through the Hague Convention, the Order was without prejudice to revisiting the issue if Sun Group was not actually able to obtain documents necessary to litigate its claims.  (Dkt. No. 148.)  In other words, if discovery through the Hague Convention prejudiced Sun Group's ability to obtain necessary documents, then the balancing test would likely have shifted in favor of Sun Group obtaining discovery through the Federal Rules of Civil Procedure.  (*Id.*)

When the Court required Sun Group to proceed through the Hague Convention to depose CRRC, the Court again made clear that the Order was without prejudice to Sun Group's renewing

United States District Court
Northern District of California

its motion if it was unable to take the deposition through the current process set forth in the Hague Convention or if the process yielded results that were substantially inferior in such a way that Sun Group could show prejudice.  (Dkt. No. 200.)  When Sun Group moved for leave to file a motion to compel a deposition through the Federal Rules of Civil Procedure, the Court denied the motion but, again, did so without prejudice if the deposition through the Hague Convention did not provide Sun Group with what it needed for this litigation.  (Dkt. No. 201 (Hearing on October 18, 2021).)  The Court again denied Sun Group's request to compel a deposition under the Federal Rules of Civil Procedure but only because Sun Group had not yet completed the process under the Hague Convention.  (Dkt. No. 256.)  The Court reiterated that the denial was without prejudice if, after completing the process, Sun Group could show that the process yielded results that were substantially inferior and it was prejudiced.  (*Id*.)  The Court similarly ordered Sun Group to "*first* proceed through the Hague Convention to obtain responses to its interrogatories."  (Dkt. No. 224 (emphasis added).)

The Court authorized Sun Group to propound discovery requests on CRRC MA pursuant to the Federal Rules of Civil Procedure, because CRRC MA is not located in China, and the Court found that Sun Group was not required to proceed through the Hague Convention to seek discovery from CRRC MA or to seek documents that were not located in China.  (Dkt. No. 217.)  Moreover, the Court Ordered CRRC to produce documents pursuant to the Federal Rules of Civil Procedure to the extent CRRC had control over one of the subsidiaries named in this action and that subsidiary had an office outside of China which held responsive documents or had access to electronically stored responsive documents.  (Dkt. 165.)  Additionally, if one of the subsidiaries named in the complaints had an office outside of China which held responsive documents or had access to electronically stored responsive documents but CRRC did not have control over that subsidiary, CRRC was ordered to inform Sun Group promptly.  (*Id*.)

Sun Group moved to compel a search from additional custodians for responsive documents, and the Court granted that motion.  (Dkt. Nos. 183, 187.)  However, the Court denied a request for a further search from the additional custodians based on CRRC's response that it conducted a thorough search that had involved counsel.  (Dkt. Nos. 195, 197.)

The Court repeatedly extended the discovery deadlines and made clear that it would extend any discovery deadlines due to the delay of proceeding first through the Hague Convention.  (Dkt. No. 204 (Hearing on October 18, 2021).)  Over two years after Sun Group filed this case, the Court set a close of non-expert discovery for September 11, 2020.  (Dkt. No. 124.)  The Court then continued the close of non-expert discovery multiple times, lastly to October 9, 2023, over three years after the original deadline.  (Dkt. Nos. 169, 193, 206, 228, 250, 258.)  In response to a request from *CRRC* to extend discovery *after the deadline had already passed*, to which *Sun Group opposed*, the Court authorized CRRC to depose Jonathan Sun, but clarified that no other discovery would be allowed.  (Dkt. No. 269.)

Sun Group never argued before discovery closed that its efforts to obtain discovery through the Hague Convention were insufficient and, thus, that it should be allowed to proceed to obtain discovery from CRRC through the Federal Rules of Civil Procedure.  Nor did the Court ever deny any request by Sun Group to extend the discovery deadlines before discovery closed.

## ANALYSIS

### A.     Applicable Legal Standard on Motion for Summary Judgment.

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims.  *Celotex Corp. v. Cattret*, 477 U.S. 317, 323-24 (1986).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" if it may affect the outcome of the case.  *Id.* at 248.  If the party moving for summary judgment does not have the ultimate burden of

United States District Court
Northern District of California

persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or that party must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, set forth specific facts showing that there is a genuine issue for trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). In addition, the party seeking to establish a genuine issue of material fact must take care to adequately point a court to the evidence precluding summary judgment because a court is "not required to comb the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (citation omitted). If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

**B.      CRRC's Motion for Summary Judgment.**

It is undisputed that CRRC MA, an entity not a party to this litigation, entered into the contracts at issue for which Sun Group seeks commission under its breach of contract claim, but Sun Group sues CRRC. Sun Group sues CRRC on a theory of *alter ego* liability, as Sun Group argues that CRRC is the *alter ego* of CRRC MA. The Court will address this threshold issue first.

       **1.      Breach of Contract Claim and *Alter ego*.**

            **i.      Discovery.**

Sun Group argues did not have access to discovery and so its burden to prove that CRRC MA was CRRC's *alter ego* should be lessened. However, the authority that Sun Group cites is inapplicable. In *DiMartini v. Ferrin*, 889 F.2d 922, 926-27 (9th Cir. 1989), the Ninth Circuit addressed a summary judgment motion on qualified immunity where all discovery had been stayed pending the determination of this threshold issue. In light of the bar on discovery, the court noted that a plaintiff had limited means to defend against a motion for summary judgment and

thus required "some relaxation of the ordinary rules of admissibility in the case of affidavits used to oppose qualified immunity motions. . . . Also, a greater tolerance of speculation and inference must be afforded." *Id*.  However, the court made clear that "[a]t a later stage in the proceedings plaintiff will, of course, be required to establish the facts by more traditional means."  *Id*. at 927; *see also Butler v. San Diego Dist. Attorney's Off.*, 370 F.3d 956, 963 (9th Cir. 2004) ("If discovery has been curtailed by the district court because the defendant has asserted official immunity from suit, the district court may to some extent relax the evidentiary standards for the plaintiff in recognition of the restrictions on discovery, but the requirement that the plaintiff produce evidence nonetheless remains.").  While Sun Group disputes whether it was able to conduct sufficient discovery, it was not subject to a complete ban on discovery.

Sun Group also requests a continuance under Federal Rule of Civil Procedure 56(d) but fails to show that a continuance is warranted.  To obtain a continuance, Sun Group must demonstrate that it diligently pursued discovery.  *See Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1005 (9th Cir. 2002) ("failure to conduct discovery diligently is grounds for the denial of a Rule 56[d] motion"); *Stitt v. Williams*, 919 F.2d 516, 525-26 (9th Cir. 1990) (affirming the denial of motion to continue summary judgment where the movant had adequate opportunity to conduct discovery but still could not produce summary judgment evidence to support its claims); *Landmark Dev. Corp. v. Chambers Corp.*, 752 F.2d 369, 372-73 (9th Cir.1985) (continuance motion under Rule 56 is not justified if the party seeking further discovery has been dilatory in conducting discovery); *Redmond v. Burlington N. R. Co. Pension Plan*, 821 F.2d 461, 469 (8th Cir. 1987) (denying continuance where moving party did not request an order to compel discovery or to extend the discovery deadline).  The Court consistently advised Sun Group that, although the Court required Sun Group to proceed through the Hague Convention, if Sun Group had demonstrated that it was unable to attain what it needed after completing the process, the Court would reevaluate allowing discovery under the Federal Rules of Civil Procedure.  (Dkt. Nos. 148, 200, 201, 224, 256; 204 (Hearing on October 18, 2021).)  However, Sun Group never sought to conduct discovery under the Federal Rules of Civil Procedure after completing the process through the Hague Convention.

United States District Court
Northern District of California

Moreover, the Court repeatedly extended the discovery deadlines and made clear that that the Court would look favorably upon a request by Sun Group to further continue deadlines.  (Dkt. No. 204 (Hearing on October 18, 2021).)  The Court continued the close of non-expert discovery multiple times, lastly to October 9, 2023, over *three years* after the original deadline.  (Dkt. Nos. 169, 193, 206, 228, 250, 258.)  Notably, the Court never denied a request from Sun Group to continue the discovery deadlines.

Additionally, for some reason Sun Group failed to pursue discovery diligently from CRRC MA, even though Sun Group was not required to proceed against CRRC MA through the Hague Convention.  Presumably, CRRC MA would have much of the evidence relevant to the *alter ego* issue, such as its financial statements and records, identity of its officers, directors, and employees were, and its records regarding corporate decisions and governance.

Only now, after discovery has closed and trial is two months away has Sun Group now requested to conduct additional discovery.  However, "[i]t's 'significantly' harder to reopen discovery once it's closed than to extend a discovery deadline." *Anderson v. Loma Linda Cmty. Hosp.*, 996 F.2d 1223 (9th Cir. 1993) (citing *West Coast Theater Corp. v. City of Portland*, 897 F.2d 1519, 1524 (9th Cir. 1990)).  In determining whether to reopen discovery, "[d]istrict courts have 'wide latitude in controlling discovery, and [their] rulings will not be overturned in the absence of a clear abuse of discretion.'" *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006) (quoting *California v. Campbell,* 138 F.3d 772, 779 (9th Cir.1998)).  The Ninth Circuit has made clear that "[a]ttempting to secure discovery after a discovery cutoff date does not cure a party's failure to conduct diligent discovery beforehand." *Cornwell*, 439 F.3d at 1027.  When ruling on a motion to amend the Court's scheduling order to reopen discovery, the Court considers the following factors:

> 1) whether trial is imminent, 2) whether the request is opposed, 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence.

*City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1066 (9th Cir. 2017).  Despite the fact that

United States District Court
Northern District of California

Sun Group bears the burden on this issue, it has not made any effort to satisfy this test.  And the Court finds that the factors weigh heavily against continuing the case schedule at this late date.  Trial is set to begin in two months in July 2024, and the parties' pretrial conference filings are due in less than a month.  CRRC opposes the request and would be prejudiced if it were granted.  It was foreseeable that *alter ego* was a threshold issue on which Sun Group bore the burden of proof, but Sun Group did not ask for an extension of time before the discovery deadline passed to again seek more discovery or extend the deadline again.  Finally, the Court finds that Sun Group has not offered anything other than speculation to show that more discovery would lead to evidence demonstrating *alter ego*.  Accordingly, the Court denies Sun Group's request to reopen discovery and to continue all deadlines in this case, including the hearing on the motion for summary judgment.

At the hearing on this motion, Sun Group clarified that it did not actually seek a continuance of the motion for summary judgment and an opportunity to conduct more discovery.  Instead, Sun Group requested that the Court deny the summary judgment motion outright based on its inability to conduct discovery.  However, the discovery period has closed.  Denying the motion for summary judgment at this point based on Sun Group's inability to conduct discovery and allowing Sun Group to proceed to trial would not make any sense if Sun Group does not have enough evidence to oppose the motion for summary judgment.

Sun Group also requests that the Court infer that CRRC hid factual support for Sun Group's claims.  (Dkt. No. 282 at p. 10.)  However, Sun Group cites no authority for its position that a Court can simply make this determination without a showing of misconduct by CRRC.  In the absence of a motion for discovery sanctions or a showing that CRRC committed misconduct, the Court will not draw any negative inference from Sun Group's failure to obtain discovery.

   **ii.**  **Judicial Notice and Evidentiary Objections Relevant to *Alter ego*.**

CRRC objects to almost all of Sun Group's evidence, including the evidence Sun Group seeks to admit through a request for judicial notice.  A court may take judicial notice of facts that are "not subject to reasonable dispute" because they are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R.

Evid. 201(b); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Thus, a court properly may take judicial notice of matters of public record but cannot take judicial notice of disputed facts contained within such records. *Khoja*, 899 F.3d at 999 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)); *see also Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (noting that judicial notice is appropriate for "undisputed matters of public record") (internal citation omitted).

CRRC contests Sun Group's request for judicial notice both based on evidentiary objections but also on the grounds that the documents, and more particularly the *contents* of those documents, are not the type which the Court may take judicial notice. Except for Exhibits 7 and 18, the Court agrees. Requests for judicial notice are limited to undisputed matters of public record or facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). With a few of exceptions, the documents in Sun Group's RJN are not matters of public record or facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Moreover, to the extent Sun Group seeks judicial notice of some of CRRC's reports that were publicly filed, the Court could not take judicial notice of the *facts contained within the documents*. *Khoja*, 899 F.3d at 999. Therefore, except for Exhibits 7 and 18, the Court DENIES Sun Group's request for judicial notice as to the *contents* of the documents.[2] Moreover, because the Court is not taking judicial notice of the contents, the Court need not address CRRC's evidentiary objections to those documents.[3]

However, the Court GRANTS Sun Group's request for judicial notice as to Exhibits 7 and 18. Exhibit 7, the exchange rate, was published online by the Federal Reserve. (Dkt. No. 282-1, ¶ 29.) The Court will take judicial notice of this document as a matter of public record.

---

[2] Exhibits 2, 4, 5, 8, 9, and 11 appear to be annual reports, or portions of annual reports, of CRRC. Even if the Court could verify that these were actually reports that were publicly filed by CRRC, and thus, the Court took take judicial notice of the fact that CRRC filed these reports, it would not assist Sun Group. Sun Group seeks the Court to take judicial notice of the contents of these reports as facts.

[3] The Court notes that Sun Group omitted Exhibits 3, 10, 13, 14, 15, 16 and 17 from its RJN. Therefore, the Court cannot take judicial notice of those exhibits for that additional reason.

1    Additionally, Exhibit 18 is CRRC MA's Articles of Organization filed with the Commonwealth of

2    Massachusetts.  (Dkt. No. 282-5 (Sun Group's RJN without exhibits); Dkt. No. 314-1

3    (Supplemental Declaration of Andrew Mytelka).)  Sun Group apparently filed the incorrect

4    document when it filed its request for judicial notice.  Sun Group belatedly filed an amended

5    Exhibit 18 on April 29, 2024.  Despite the fact that Sun Group amended its exhibit after the

6    motion was submitted and did so without leave of Court, the Court will consider the amended

7    Exhibit 18 and take judicial notice of this document as a publicly filed document.  Sun Group cites

8    to this Exhibit to show that Yu Weiping was the President and a Director of CNR MA.  (Dkt. No.

9    282 at p. 3.)  The Court takes judicial notice of this fact.

10         In addition to Sun Group's RJN, CRRC objects to the few exhibits relevant to the *alter ego*

11   issue that Sun Group attaches to the Declaration of Andrew Mytelka on the grounds that that the

12   declarant does not have personal knowledge of these exhibits, that Sun Group cannot authenticate

13   these documents at trial, and that they contain inadmissible hearsay.  In *Orr v. Bank of Am., NT &*

14   *SA*, 285 F.3d 764, 773 (9th Cir. 2002), the court that "[a] trial court can only consider admissible

15   evidence in ruling on a motion for summary judgment."  However, the Ninth Circuit has

16   subsequently made clear that, based on amendments to Rule 56, "[c]ourts must now consider

17   unauthenticated evidence at summary judgment if the evidence can 'be presented in a *form* that

18   would be admissible' at trial."  *Harlow v. Chaffey Cmty. Coll. Dist.*, 2022 WL 4077103, at *1 (9th

19   Cir. Sept. 6, 2022) (emphasis in original) (citing Fed. R. Civ. P. 56(c)(2) and advisory comm. note

20   to 2010 Amendments (proponent of evidence can either "show that the material is admissible as

21   presented or explain the admissible form that is anticipated" at trial)).  The Court will address

22   CRRC's objections as to each document and will consider whether Sun Group has demonstrated

23   that it *could* present the evidence in a form that would be admissible at trial.

24              **a.    Exhibit A to the Declaration of Andrew Mytelka – CRRC MA's**
                       **2015 Financial Statements.**
25
26        CRRC objects to CRRC MA's financial statements on the grounds of authenticity and

27   hearsay.  Presumably, Sun Group could have obtained testimony from CRRC MA to authenticate

28   these statements and to show that they are business records under Federal Rule of Evidence

United States District Court
Northern District of California

803(6).  However, Sun Group did not depose anyone from CRRC MA, and CRRC MA is too far away from this District to be subpoenaed to attend trial under Federal Rule of Civil Procedure 45(c)(1)(A).  Sun Group argues that CRRC MA's declaration in support of the motion to seal these documents authenticates these documents.  (Dkt. No. 287.)  Even if that were true, Sun Group does not offer any evidence or suggestion of how it could, at trial, without the presence of CRRC MA or any deposition testimony from CRCC MA, demonstrate that these statements are admissible as business records under Federal Rule of Evidence 803(6), which requires a testimony or a certification that the required conditions have been satisfied.  *See* Fed. R. Evid. 803(6)(D).

Sun Group also claims that the financial statements are admissible as a statement of a party opponent, but CRRC MA is not a party.  Sun Group's problem is circular, because Sun Group relies on this exhibit to prove that CRRC MA should be considered one with CRRC as CRRC's *alter ego* but cannot admit this evidence as a statement of a party opponent unless and until Sun Group makes that showing.  To the extent Sun Group claims that CRRC MA was acting at the direction and authorization of CRRC in preparing these financial statements, Sun Group would be required to prove that fact before CRRC MA could be considered a party opponent.[4]  Sun Group fails to demonstrate that CRRC MA, as a subsidiary of CRRC, was authorized to speak on CRRC's behalf or was an agent of CRRC.  Instead, Sun Group merely points to documents submitted with its RJN.  However, as noted above, the Court does not take judicial notice of the contents of those documents.  Moreover, even if the Court did take judicial notice of them, they do not demonstrate that CRRC MA was authorized to speak on behalf of CRRC or that CRRC MA was an agent of CRRC.  Even with those documents, Sun Group fails to demonstrate anything other than that CRRC MA was a subsidiary of CRRC.  Accordingly, Sun Group cannot rely on the hearsay exception for admission of a party opponent for documents from CRRC MA.

Finally, Sun Group argues that this exhibit is admissible under the residual exception under Federal Rule of Evidence 807 which provides that a hearsay statement is not excluded "if the

---

[4] Federal Rule of Evidence 801(d)(2)(C) and (D) provide an exception to hearsay when the statement was made by a party opponent if the statement "was made by a person whom the party authorized to make a statement on the subject" or "made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"

United States District Court
Northern District of California

statement is supported by sufficient guarantees of trustworthiness – after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement" and that "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." *See* Fed. R. Evid. 807(a).  However, Sun Group does not make any effort to make the required showing.  Accordingly, the Court SUSTAINS CRRC's objections to this exhibit.

> **b.** **Exhibit C to Mytelka Declaration – an Agreement between CNR, CNR MA, and Sojitz.**

Exhibit C is purportedly an agreement, unsigned and undated, between CNR, CNR MA and Sojitz Corporation of America, a New York corporation ("Sojitz"), a third-party which appears to have been involved with the project with the MBTA.  Again, CRRC objects on the grounds of authenticity and hearsay.  Sun Group states that it could subpoena an employee from the Sojitz office in San Jose for trial to authenticate the document and testify that it is a business record, and Sun Group points to Sojitz's website stating that it has an office in San Jose.  (Dkt. No. 314 at p. 32.)  However, there is no indication of who works at the San Jose office and whether there would be an employee with knowledge of an agreement between the New York corporation and CRRC and CRRC MA from October 2014.  While Sun Group states that Sojitz produced this document, Sun Group does not whether the New York office or the San Jose office produced it.

In the absence of this information or in the absence of a custodian from San Jose capable of authenticating this document and demonstrating that it is a business record, Sun Group fails to overcome CRRC's objections.  Accordingly, the Court SUSTAINS CRRC's objections to this exhibit.

> **c.** **Exhibit D to Mytelka Declaration – Minutes from a Massachusetts Department of Transportation Senior Management Meeting.**

Exhibit D is purportedly minutes from a quarterly senior management meeting of the Massachusetts Department of Transportation that Sojitz produced in response to a third-party subpoena from Sun Group.  Again, CRRC objects on the grounds of authenticity and hearsay.  This report contains double hearsay – minutes of a meeting of the management from the

Massachusetts Department of Transportation reporting on what CRRC reported to them.  Sun Group again argues that an employee from the Sojitz office in San Jose could authenticate the document and testify that it is a business record or a public record recorded or filed with the Massachusetts Department of Transportation.  It is not clear how an employee from a private company, even if there were an employee there with knowledge of this document, could authenticate Exhibit D as a public record or as a business record.  With respect to the hearsay objection, Sun Group argues that it would be admissible as a statement of a party opponent, but the Massachusetts Department of Transportation is not a party to this action.  Thus, Sun Group could not overcome the first hurdle of the hearsay problem – the statement by the Massachusetts Department of Transportation, even though the second part of the hearsay, the statements by CRRC, would be admissible as a statement by party opponent.  Therefore, the Court SUSTAINS CRRC's objections to this exhibit.

### iii.    Sun Group's Expert – Thomas Y. Man

CRRC separately moves to strike Sun Group's expert, Thomas Y. Man ("Man").  The Court addresses that motion with respect to Man's opinions on the *alter ego* issue and Sun Group's reliance on his opinions on *alter ego* to oppose CRRC's motion for summary judgment.

Man states that he was hired by Sun Group to provide an opinion on the relationship between CRRC and CRRC MA at the time that CRRC MA submitted a bid for a project with the MBTA in 2014.  (Dkt. No. 282-4 (Declaration of Thomas Man), ¶ 1.)  Man is a professor at Peking University School of Transnational Law in Shenzhen, China.  (*Id.*, ¶ 2.)  Before his work as a professor, Man practiced law for 18 years with international law firms.  His "practice dealt mainly with various commercial transactions and disputes, mostly in cross-border, cross-jurisdictional, cross-cultural contexts involving both American and Chinese laws, institutions, business practices, and social customs."  (*Id.*, ¶ 3.)  He continues to serve as a consultant for Chinese law firms on matters involving Chinese and foreign parties in business transactions and commercial disputes.  (*Id.*, ¶ 5.)  The documents Man reviewed to prepare his opinions, in addition to the pleadings and Orders filed in this case, include CRRC's website and its annual reports, CRRC MA's website, KPMG's financial statements for CRRC, the Letter of Request Commission

Rogatoire, the transcript of the Disposition of CRRC Representative by the Beijing Intermediary People's Court on August 1, 2022, and email correspondence between CRRC, CRRC MA and Sojitz Corporation of America ("Sojitz").  (*Id.*, Ex. 1 (Man's Expert Report) at § C.1, Ex. II.)  In preparing his report, Man relied on his "general knowledge, training, practical experience, and professional experience in cross-border, bilingual business transactions involving American and Chinese parties and using English and Chinese languages as the means of communication."  (*Id.*, Ex. 1 at § C.2.)

Man relies on the following facts to opine on the *alter ego* issue (*Id.*, Ex. 1 at § III):[5]

- CRRC MA was incorporated in March 2014 in Massachusetts as a joint venture company between CRRC and CRRC Changchun.
- CRRC was the majority owner of CRRC Changchun at that time.
- CRRC's Annual Report of 2015 includes CRRC MA in its consolidated financial statements and indicates that CRRC owns 51 percent of CRRC MA's shares.
- CRRC MA acted as the contractor to bid for the project with the MBTA in 2014.
- At the time, two principal officers of CRRC – Yu Weiping and Yu Yanbin – served concurrently as officers of CRRC MA.
- Yu Weiping contacted Jonathan Sun of Sun Group to enlist Sun Group's support for the MBTA project.
- Both Yu Weiping and Yu Yanbin attended the negotiations in New York with Sun Group in 2014.
- CRRC set up CRRC MA for the express purpose of enhancing its chances to win the MBTA project.
- CRRC submitted a bid for the MBTA project as the bidder and CRRC MA as the contractor.
- CRRC provided technical, financial, human and other resources to CRRC MA and

---

[5] Man uses the following headings: dominant ownership, sharing of personnel, co-mingling of resources, and control of corporate decisions.  As these appear to be mere characterizations of the facts Man describes, and are not actual facts or findings themselves, the Court will not consider Man's headings.  Instead, the Court focuses on the facts he describes.

1    guaranteed CRRC MA's performance.

2    • CRRC told the MBTA that it would be the financially responsible party for CRRC

3    MA for the project.

4    • Man did not locate any record where CRRC MA made any independent decisions

5    with respect to the MBTA project tender process.

6    Man then concludes:

7    1. Currently available information . . . demonstrated unity of
     interests, ownership, personnel, resources, and control between
8    [CRRC] and [CRRC MA], which uniformly points to the
     direction that an *alter ego* relationship existed between these two
9    affiliated entities.

10   2. Admittedly, I have access to date to only limited information, but
     the information I have reviewed so far, in my view, is reasonable
11   sufficient to establish that [CRRC MA] acted as [CRRC's] *alter
     ego* at least in the process of procuring the MBTA Project in 2014.

12   (*Id.*, Ex. 1 at § III.F.)

13       There are several problems with Sun Group's reliance on Man as an expert on the *alter ego*

14   issue.  First, as Sun Group concedes, Man may not opine on the legal conclusion as to whether

15   there is an *alter ego* relationship.  "Experts may interpret and analyze factual evidence but may not

16   testify about the law."  *S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733, 749 (9th Cir. 2005)

17   (citing *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996)); *see also Nationwide

18   Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("an expert witness

19   cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law.")

20   (emphasis in original); *In re Centrix Fin., LLC*, 2015 WL 3523399, at *1 (D. Colo. June 3, 2015)

21   (finding expert's ultimate conclusion on *alter ego* was impermissible).  Therefore, the Court will

22   not consider Man's opinion that CRRC MA acted as CRRC's *alter ego*.

23       In this absence, Sun Group fails to clarify what opinion, other than the ultimate legal

24   conclusion, that Man does proffer.  Man states: "information . . . demonstrated unity of interests,

25   ownership, personnel, resources, and control between [CRRC] and [CRRC MA], which uniformly

26   points to the direction that an *alter ego* relationship existed between these two affiliated entities.

27   This appears to be just another way of stating that an *alter ego* relationship existed.  In fact, in its

28

*United States District Court*
*Northern District of California*

opposition to the motion for summary judgment, Sun Group only cites to Man's ultimate legal conclusion that an *alter ego* relationship existed.  (Dkt. No. 282 at pp. 2, 5, 10-11.)

Second, to the extent Man offers an opinion on unity of interests, ownership, personnel, resources and control (other than the legal conclusion that they weigh towards a finding an *alter ego* relationship exists), Sun Group fails to demonstrate that Man has any specialized experience or expertise in this area to assist the trier of fact in understanding the evidence.  Notably, Man did not conduct a financial forensic investigation or review, and there is no indication that he reviewed CRRC's or CRRC MA's financial documents.  Nor does Man have any specialized experience or knowledge with norms of corporate governance, and Man did not discuss any failure by CRRC or CRRC MA to observe corporate formalities.  Man states that he is an expert on commercial transactions and disputes in cross-border, cross-jurisdictional, cross-cultural contexts involving both American and Chinese laws, institutions, business practices, and social customs.  Sun Group does not explain how this area of expertise qualifies Man to provide an opinion that would assist the trier of fact on understanding the evidence regarding unity of interest.

Finally, to the extent Man does offer an opinion other than legal conclusions, his opinion concerns only a snapshot in time with respect to one project – that an *alter ego* relationship existed with respect to CRRC MA's *bid* to the MBTA.  The unity of interest and ownership prong requires Sun Group to show that the "parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015) (internal quotations omitted).  "This test envisions pervasive control over the subsidiary, such as when a parent corporation dictates every facet of the subsidiary's business – from broad policy decisions to routine matters of day-to-day operation." *Id*.  It is not clear how an opinion as to such a narrow scope – one aspect of one project, even if it were CRRC MA's main project – would assist the trier of fact in making a determination as to CRRC's pervasive control over CRRC MA sufficient to support finding the existence of an *alter ego* relationship.

Therefore, the Court will not consider Man's opinions.

### iv.    Summary of Sun Group's Facts in Support of *Alter ego*.

As discussed above, much of Sun Group's evidence is not admissible.  Despite the rulings

United States District Court
Northern District of California

on Sun Group's RJN and evidence above, the Court here summarizes the relevant facts, *including those from Sun Group's inadmissible evidence*, because, even if the Court did consider them, they would be insufficient to demonstrate that CRRC MA was the *alter ego* of CRRC.  These facts are as follows:

- Yu Yanbin and Yu Weiping were two of the five CRRC personnel who attended the meeting with Sun Group in New York City in 2014.  (Dkt. No. 282-2 (Exhibit B to the Mytelka Decl.).)[6]

- Yu Weiping was the President and a Director of CNR MA in 2014.  (Dkt. No. 314-1 (Amended Ex. 18 to Sun Group's RJN).)

- At the time of CRRC MA's bid to the MBTA, Yu Yanbin was CRRC MA's Treasurer.

- CRRC agreed to act as the financially responsible party for CRRC MA to the MBTA.  (*Id.*)

- In an unsigned amendment to a consulting agreement between CRRC, CRRC MA, and Sojitz in October 2014, Sojitz consented to CRRC's assignment of CRRC's rights and obligations under the consulting agreement to CRRC MA on the condition that CRRC guaranteed all of CRRC MA's obligations under the consulting agreement.  (Dkt. No. 282-2 (Exhibit C to the Mytelka Decl.).)

- CRRC MA was a joint venture of CRRC and CRRC Changchun, another subsidiary of CRRC, and CRRC and CRRC Changchun were the two shareholders of CRRC MA.

- CRRC authorized CRRC MA to execute and submit a proposal for the project with the MBTA and to take any other actions necessary or appropriate in connection with the project.

- CRRC was authorized to make decisions regarding acquisition and disposal of assets and other major financial actions of its subsidiaries.

---

[6] Sun Group argues that Yu Yanbin and Yu Weiping were also officers of CRRC MA but fails to provide admissible evidence on this point.

- In 2017, CRRC provided economic guarantees for CRRC MA and CRRC Changchun and assumed joint and several liability for their incurred debts.
- CRRC is controlled by the Chinese government.
- Both CRRC MA and CRRC Changchun are wholly, or nearly wholly, owned subsidiaries of CRRC.
- In 2017 Annual Report, CRRC issued convertible bonds to help fund the MBTA project.
- CRRC used the term "Group" to refer to it and its subsidiaries in annual reports.
- CRRC referred to the MBTA project as the "Group's" project in annual reports.
- In other public reports, CRRC discussed the MBTA project and CRRC MA's assets as its own.

### v. *Alter Ego* **Analysis.**

Under California law, the party asserting that one company is the *alter ego* of another must demonstrate two conditions: (1) that there is such unity of interest and ownership that the separate personalities of the two corporations no longer exist and (2) that failure to disregard the corporation would result in fraud or injustice. *Watson v. Commonwealth Insurance Co.*, 8 Cal. 2d 61, 68 (1936); *see also AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996).[7] "There is a strong presumption against disregarding corporate identities and finding a person to be the alter ego of a corporation." *Tarel Seven Design, Inc. v. Magni Grp., Inc.*, 1990 WL 118290, at *4 (C.D. Cal. May 30, 1990); *see also Laird v. Capital Cities/ABC*, 68 Cal. App. 4th 727, 737 (1998) (same); *Calvert v. Huckins,* 875 F. Supp. 674, 678 (E.D. Cal. 1995) (holding there is a general presumption in favor of respecting the corporate entity.). Finding *alter ego* liability "is an extreme remedy, sparingly used." *Hasso v. Hapke*, 227 Cal. App. 4th 107, 155 (2014); *see also Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 539 (2000) ("alter ego is an extreme

---

[7] Sun Group appears to rely on the Court's ruling on *alter ego* in an order on a motion to dismiss when Sun Group argues that the Court has already found that CRRC is the *alter ego* of CRRC MA.  (Dkt. No. 282 at p. 9.)  However, at that point the Court was merely examining Sun Groups allegations.  That ruling has no bearing on whether Sun Group has sufficient evidence to preclude summary judgment on this issue.

United States District Court
Northern District of California

remedy, sparingly used"); *Calvert*, 875 F. Supp. at 678 ("Disregarding the corporate entity is recognized as an 'extreme remedy,' and courts will only pierce the corporate veil in 'exceptional circumstances.'").  The *alter ego* doctrine generally "exists to hold accountable those who misuse the corporate form to carry out wrongdoing." *Pac. Bell Tel. Co. v. 88 Connection Corp.*, 2016 WL 3257656, at *3 (N.D. Cal. June 14, 2016).  Sun Group bears the burden of establishing *alter ego*. *See UA Local 343 v. Nor–Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994).

**a.      Unity of Interest.**

Courts consider the following factors when assessing the unity of interest prong of the *alter ego* test:

> (1) inadequate capitalization, (2) commingling of funds and other assets, (3) disregard of corporate formalities and failure to maintain an arm's length relationship, (4) holding out by one entity that is liable to the debts of the other, (5) identical equitable ownership, (6) use of the same offices and employees, (7) lack of segregation of corporate records, (8) manipulating assets between entities so as to concentrate the assets in one and the liabilities in another, and (9) identical directors and officers.

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 635 (N.D. Cal. 2020) (citing *Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1250 (9th Cir. 2017)).

As noted above, the unity of interest and ownership prong requires Sun Group to show that the "parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Ranza*, 793 F.3d at 1073 (internal quotations omitted).  "This test envisions pervasive control over the subsidiary, such as when a parent corporation dictates every facet of the subsidiary's business – from broad policy decisions to routine matters of day-to-day operation." *Id.* (internal quotations omitted); *see also Doe v. Unocal Corp.*, 248 F.3d 926, 928 (9th Cir. 2001) (one company being "involved directly in decision-making" of another where each entity "observe[s] all of the corporate formalities necessary to maintain corporate separateness" is insufficient to show that they should be treated as a single entity).

"Total ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Ranza*, 793 F.3d at 1074-75; *see also Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1149 (9th Cir. 2004) (citation omitted) ("The mere fact of sole

United States District Court<br>Northern District of California

20

ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law."). Moreover, merely directing macro decisions is insufficient. Instead, the parent must control the internal affairs or daily operations of the subsidiary, or "micro-decisions." *Doe v. Unocal Corp.*, 248 F.3d 926, 927 (9th Cir. 2001) ("[a] parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego"); *see also Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1459-60 (2d Cir. 1995) (finding no alter ego liability where parental approval required for leases, major capital expenditures, and the sale of subsidiary assets). Additionally, a parent corporation may be directly involved in the activities of its "subsidiaries without incurring liability so long as that involvement is 'consistent with the parent's investor status.'" *Unocal*, 248 F.2d at 926 (quoting *United States v. Bestfoods*, 524 U.S. 51, 72 (1998)). "Appropriate parental involvement includes: 'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures[.]'" *Id.* (quoting *BestFoods*, 524 U.S. at 72). The Ninth Circuit found "no alter ego relationship was created where the parent company guaranteed loans for the subsidiary, reviewed and approved major decisions, placed several of its directors on the subsidiary's board, and was closely involved in the subsidiary's pricing decisions." *Unocal*, 248 F.3d at 927.

The court's analysis in *Sonora Diamond* is particularly instructive. In that case, the subsidiary bought a mine in California. *Sonora Diamond*, 83 Cal. App. 4th at 530. The parent company in its annual reports refer to the mine as its own. *Id.* at 533. The parent company loaned the subsidiary $45 million to operate the mine, and that loan, never memorialized in any document, was unpaid, unsecured, and interest-free, but appeared on each company's books as an intercompany loan. *Id.* The parent company guaranteed the subsidiary's $30 million loan from banks and occasionally ordered the subsidiary to transfer money between its accounts. *Id.* at 534. The parent company made all of the subsidiary's financial decisions during the process of closing the mine and, when needed, transferred money to the subsidiary to cover payments. *Id.* The court noted that the "relationship of owner to owned contemplates a close financial connection between parent and subsidiary and a certain degree of direction and management exercised by the former

over the latter." *Id.* at 541.  Thus, "[t]he nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence." *Id* at 542.  The parent company was involved in the initial financing of the subsidiaries mine operation, guaranteed key financial obligations, and provided ongoing financial support for the subsidiary.  The court held that such conduct was not outside the normal expectations of the parent-subsidiary relationship." *Id.* at 546-47.  All of the financial transactions were maintained in the records of each company and documented as intercompany loans.  *Id*. at 547.

The court concluded that the parent company's acts did not go beyond what was normally expected of an owner of the stock of an unprofitable subsidiary corporation.  *Id*.  Additionally, the court held that the fact that there were some interlocking directors and officers was "insufficient to rebut the presumption that each common officer or director wore the appropriate 'hat' when making corporate and operational decisions for the respective entities." *Id*. at 549.  The court held that the parent company's practice of issuing consolidated annual reports with combined information pertaining to itself and its subsidiary was standard business practice.  "[C]onsolidating the activities of a subsidiary into the parent's annual reports is a common business practice.  It is allowed by both the Internal Revenue Service and the Securities and Exchange Commission, and it is recommended by generally accepted accounting principles." *Id*. at 550 (quoting *Calvert*, 875 F. Supp. at 678-79.)  Thus, "the use of 'we' or 'the Company' or [the parent's name] in the several reports in evidence did not prove that [the parent] and [subsidiary] were, in actual practice, a single entity." *Id*.  The Court held that all of these acts were of a type or nature deemed by the law to be appropriate to the parent-subsidiary relationship.  *Id*. at 551.

As discussed above, Sun Group has very little admissible evidence relevant to the *alter ego* issue.  For this reason alone, the court finds that Sun Group fails to demonstrate the existence of a material fact that would preclude the Court from granting CRRC's motion for summary judgment on this issue.  But even if the Court were to consider the information Sun Group unsuccessfully tried to enter as evidence, none of it shows anything other than an appropriate parent-subsidiary

22

relationship and certainly nothing close to the type of ownership and control required to eviscerate the separate corporate identity of CRRC MA.

Sun Group's proposed evidence demonstrates that CRRC had two overlapping officers or directors with CRRC MA, guaranteed CRRC MA's loans and obligations, funded CRRC MA, filed consolidated annual reports and referred to CRRC MA's assets as its own, owned CRRC MA, and directed CRRC MA's major or macro decisions.  All of these activities are consistent with CRRC's status as a parent and investor in CRRC MA.  *Unocal*, 248 F.2d at 926; *see also Sonora Diamond*, 83 Cal. App. 4th at 530-551; *Leek v. Cooper,* 125 Cal. Rptr. 3d 56, 68 (2011) ("An allegation that a person owns all of the corporate stock and makes all of the management decisions is insufficient to cause the court to disregard the corporate entity.").  Notably, Sun Group does not show that CRRC controlled CRRC MA's day-to-day activities or that CRRC and CRRC MA failed to document or record any of these activities or otherwise disregarded any corporate formalities.

Therefore, Sun Group fails to demonstrate the existence of a question of fact that precludes summary judgment as to unity of interest.

### b. Fraud or Injustice.

Where a plaintiff fails to satisfy the "unity of interest" prong, a court need not analyze the "fraud or injustice prong."  *Ranza*, 793 F.3d at 1075, n. 9 (citation omitted).  Nevertheless, Sun Group's failure to demonstrate any fraud or injustice provides an independent reason for granting CRRC's motion for summary judgment.  "[B]ecause piercing the corporate veil is a remedy founded on principles of equity, there must be enough evidence to support a finding that failure to look past the corporate entity would 'sanction a fraud or promote injustice.'"  *Calvert*, 875 F. Supp. at 678 (quoting *Marr v. Postal Union Life Ins. Co.,* 40 Cal. App. 2d 673, 681 (1940)).  The second prong of the *alter ego* test thus requires Sun to show "facts sufficient to demonstrate that conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form."  *Successor Agency to Former Emeryville Redevelopment Agency v. Swagelok Co.*, 364 F. Supp. 3d 1061, 1082 (N.D. Cal. 2019) (citing *Prod. & Ventures Int'l v. Axus Stationary (Shanghai) Ltd.*, 2017 WL 201703, at *8 (N.D. Cal. Jan. 18, 2017)); *see also Neilson v.*

*Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1117 (C.D. Cal. 2003) ("California courts generally require some evidence of bad faith conduct on the part of defendants before concluding that an inequitable result justifies an alter ego finding") (citing *Mid-Century Ins. Co. v. Gardner*, 9 Cal. App. 4th 1205, 1213 (1992) ("The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable, under the applicable rule above cited, for the equitable owner of a corporation to hide behind its corporate veil") (internal citation and quotation marks omitted)).

Sun Group's entire argument is that it would be unjust to deny it recovery for an alleged breach of its agreement with *CRRC* for a contract *CRRC MA* made with the MBTA because, according to Sun Group, CRRC controls CRRC MA.  To the extent Sun Group argues that CRRC MA's role in the contract with the MBTA was to deprive Sun Group of its commission from CRRC, Sun Group fails to submit any evidence to support this argument.  Instead, Sun Group's argument is simply that it would be unjust if its claim were unsuccessful and if it could not collect commission from CRRC for CRRC MA's bid.  But Sun Group's ability to succeed on its claim against CRRC is not an inequity in and of itself.  As multiple courts have held, merely being unable to collect is not an inequity.  *Neilson*, 290 F. Supp. 2d at 1117 ("California courts have rejected the view that the potential difficulty a plaintiff faces collecting a judgment is an inequitable result that warrants application of the alter ego doctrine."); *Payoda, Inc. v. Photon Infotech, Inc.*, 2015 WL 4593911, at *4 (N.D. Cal. July 30, 2015) (quoting *Sonora Diamond*, 83 Cal. App. 4th at 539) ("California courts have consistently rejected this argument, finding that '[t]he alter ego doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form . . . . Difficulty in enforcing a judgment or collecting a debt does not satisfy [the inequitable results] standard.'").  Sun Group fails to provide any evidence of any fraud or other wrongdoing by CRRC or CRRC MA to show that there is a disputed question of fact.  Accordingly, the Court grants CRRC's motion for summary judgment as to Sun Group's claim for breach of contract because Sun Group fails to show the existence of a question of fact regarding the *alter ego* issue.

United States District Court
Northern District of California

2.       **Breach of Implied Covenant of Good Faith and Fair Dealing.**

Sun Group argues that the Cooperation Agreement contained a right of first refusal that required CRRC to provide Sun Group an opportunity to partner on all projects to manufacture rail cars, regardless of whether CRRC intended to or did use a partner, and that CRRC directed its subsidiaries to place bids to avoid this right of first refusal and its obligation to pay commission to Sun Group.  Sun Group alleges that CRRC directed its subsidiaries to submit bids in the subsidiaries' names instead of in the name of CRRC but that the bids were made effectively on behalf of CRRC.  (Dkt. 102, ¶¶ 74, 76.)  Sun Group alleges that CRRC used its subsidiaries to circumvent CRRC's contractual obligation to Sun Group under the Cooperation Agreement and to avoid paying Sun Group the commission required under the Cooperation Agreement.  (*Id*.)  Sun Group further alleges that CRRC received the benefits of these bids, even where the bids were submitted by subsidiaries that were not *alter egos* of CRRC.  (*Id*.)  As noted above, Sun Group did not even submit the five contracts that it argues that CRRC directed its subsidiaries enter into so that CRCC could avoid paying Sun Group commission under the Cooperation Agreement.  And, as noted above, Sun Group also did not even submit the Cooperation Agreement for consideration in opposing CRRC's motion.  Nevertheless, the Court will describe the other evidence relevant to this claim.

Jonathan Sun, the "primary representative of Sun," testified that he felt that CRRC cheated because it did not pay Sun Group.  (Dkt. No. 282-2 (Exhibits to Mytelka Decl.), Ex. H (Excerpt of Jonathan Sun's Deposition Transcript) at 131:4-19.)  Sun explained that his evidence to support this feeling was the fact that the Chairman of CRRC sent Sun an email on September 27, 2016, to end the 2014 Cooperation Agreement and that the Chairman did not answer two or three of Sun's calls after that email.  (*Id*. at 136:20-137:23, 141:2-146:23.)  Sun Group did not provide this email for consideration.

"[U]nder California law, all contracts have an implied covenant of good faith and fair dealing."  *In re Vylene Enterprises, Inc.*, 90 F.3d 1472, 1477 (9th Cir. 1996) (citing *Harm v. Frasher*, 181 Cal. App. 2d 405, 417 (1960)).  The covenant "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the

agreement actually made." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349 (2000).  However, the covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id*.  Thus, to the extent a plaintiff seeks to impose limits "beyond those to which the parties actually agreed, the [implied covenant] claim is invalid.  To the extent the implied covenant claim seeks simply to invoke terms to which the parties did agree, it is superfluous." *Id*. at 352 (emphasis in original); see also *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990) (holding that if the allegations supporting a claim for breach of the implied covenant of good faith and fair dealing "do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.").  "The central teaching of *Guz* is that in most cases, a claim for breach of the implied covenant can add nothing to a claim for breach of contract." *Lamke v. Sunstate Equipment Co., LLC.*, 387 F. Supp. 2d 1044, 1047 (N.D. Cal. 2004).

However, a plaintiff may bring implied covenant claim where the plaintiff alleges that the defendant acted in bad faith to frustrate the contract's benefits.  *See Guz*, 24 Cal. 4th at 353 n. 18 (acknowledging that "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled . . . ."); *see also McCollum v. XCare.net, Inc.*, 212 F. Supp. 2d 1142, 1153 (N.D. Cal. 2002) (applying California law).

Sun Group cannot meet its burden to show a disputed issue of fact on the claim for breach of the implied covenant of good faith and fair dealing fails because Sun Group does not provide *any evidence* to support its allegations.  As noted above, Sun Group fails to provide evidence of the Cooperation Agreement, the five contracts at issue, and the email terminating the agreement.  At most, Sun Group submits the testimony from Sun explaining his belief that CRRC terminated the Cooperation Agreement in bad faith.  There is no evidence that CRRC received the benefits of these bids.  The lack of evidence on this point is fatal to Sun Group's claim.  Additionally, Sun Group does not have any evidence that CRRC directed its subsidiaries to bid on these rail

contracts, which, again, is fatal to Sun Group's claim.[8]  Accordingly, the Court grants CRRC's motion for summary judgment on Sun Group's claim for breach of the implied covenant of good faith and fair dealing.

## CONCLUSION

For the foregoing reasons, the Court GRANTS CRRC's motion for summary judgment. The Court will issue a separate judgment.  The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: May 14, 2024

_____

SALLIE KIM
United States Magistrate Judge

United States District Court
Northern District of California

---

[8] The only evidence regarding CRRC's purported control over and direction of a subsidiary and a rail contract is with respect to CRRC MA and the MBTA contract.  However, the MBTA contract is not part of Sun Group's claim for breach of the implied covenant of good faith and fair dealing.  (Dkt. No. 109 (Order Regarding Motions to Dismiss TAC) at pp. 11-12.)